# EXHIBIT F

**In The Matter Of:**

*Ernest Richards, II and Rick Richards v.*
*Octane Environmental, LLC, et al.*

---

*David Alvarez*
*October 27, 2020*

---

*WV Depos*
*2413 East Pike Street, Suite 119*
*Clarksburg, West Virginia 26301*

Original File David Alvarez.prn

Min-U-Script® with Word Index

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

RICK RICHARDS, and
ERNEST RICHARDS, II,
Plaintiffs/Counter-Defendants,
v. Civil Action No.: 1:18-CV-158

OCTANE ENVIRONMENTAL, LLC, an Ohio limited liability company,
TERENCE SEIKEL,
CRAIG STACY, and
JOSEPH SEIKEL,
Defendants/Counter Claimants/
Third-Party Plaintiffs/Counter Defendant,

v.

JASON RICHARDS,
AMANDA HUNT,
AARON GILES, and
JACOB RICHARDS,
Third-Party Defendants, Counter Claimants against Octane Environmental, LLC.

DEPOSITION OF DAVID ALVAREZ

WV Depos
304-566-7800

DEPOSITION OF DAVID ALVAREZ

a witness herein, called for examination, taken pursuant to the Federal Rules of Civil Procedure, by and before Amy Harris, a Court Reporter and Notary Public in and for the State of West Virginia via Zoom videoconferencing on Tuesday, October 27, 2020 beginning at 9:02 a.m.

WV Depos
304-566-7800

APPEARANCES

Michael A. Secret, Esquire
Christopher Brumley, Esquire
Flaherty Sensabaugh Bonasso, PLLC
Post Office Box 3843
Charleston, West Virginia 25338-3843
Counsel for Plaintiffs/Counterclaim Defendants

Kenneth L. Hopper, Esquire
Pullin, Fowler, Flanagan, Brown & Poe, PLLC
2414 Cranberry Square
Morgantown, West Virginia 26508
Counsel for Defendants

Wes Prince, Esquire
Shaffer Madia Law, PLLC
343 West Main Street
Clarksburg, West Virginia 26301
Counsel for Third-Party Defendants

ALSO PRESENT:
Terence Seikel
Joseph Seikel
Michael Cardi, Esquire

WV Depos
304-566-7800

EXAMINATION

| | Page |
|---|---|
| Examination by Mr. Hopper | 5 |
| Examination by Mr. Secret | 44 |
| Examination by Mr. Hopper | 45 |
| Reporter's Certificate | 47 |
| Errata Sheet | 48 |

WV Depos
304-566-7800

Ernest Richards, II and Rick Richards v. Octane Environmental, LLC, et al.
David Alvarez
October 27, 2020

Page 5

-----
DAVID ALVAREZ
a witness herein, having been first duly sworn was examined and testified as follows:
-----
EXAMINATION
BY MR. HOPPER:
Q. Mr. Alvarez, my name is Kenneth Hopper. Can you see me okay on the screen?
A. Yeah. Hi, Kenneth. How are you?

Page 7

Page 6

Page 8

Min-U-Script®
WV Depos
304-566-7800
(2) Pages 5 - 8

Page 9

Page 10

Q. Okay. And then you mentioned you're also involved in the logistics for the oil and gas industry. Is that Energy Transportation?
A. That would be correct.
Q. Okay. And then Energy Resource Group, does that also fall underneath that realm?
A. That's not a company that I own.
Q. Okay, okay. As I understand it, Jason Henderson, he's the owner of that company. Is that correct?
A. That is correct.
Q. At any point in time, did you have any ownership interest in that company?
A. No.
Q. Okay. Mr. Alvarez, do you know who Craig Stacy is?
A. I do not.
Q. Okay. Ever hear that name before?
A. Not that I recall. But I see a lot of people in my daily travels.
Q. I understand.
How about --
A. But --
Q. I'm sorry, sir. I interrupted you. Go ahead.

Page 11

A. Okay. No. Go ahead.
Q. Do you know Terence Seikel?
A. I think I met him a couple of times at my restaurant. But do I know him? I don't believe. I mean, in passing.
Q. Okay. Do you remember when you saw him at your restaurant?
A. No. I guess be more specific, because --
Q. Do you remember what year --
A. -- I think I saw him, you know, the last -- in the last -- and there again, it would be speculative to answer it, but I saw him a while back recently, maybe in the last year, but I don't -- I don't recall. Said hello.
Q. Do you remember when you met him the first time?
A. I don't -- I mean, I remember meeting him at the restaurant, but don't really recall the details.
Q. It's been told to me that your all's meeting happened around May of 2018. Does that sound about right?
MR. CARDI: Object to form.
A. There again, I mean, I don't know the date or whatever. I see -- I see lots of people at my restaurant.

Page 12

Q. I understand.
This first time that you met Terence Seikel, do you remember what was discussed?
A. We talked about the industry, as I recall.
Q. Okay.
A. But --
Q. When did -- my apologies, sir. I interrupted you again.
A. No, no. You're good.
Q. So you talked about the oil and gas industry?
A. I would assume. But there again, I don't even -- don't remember the exact time, but I do recall having met Mr. Seikel.
Q. Do you remember who else was with Mr. Seikel when this first meeting happened?
A. I'm not 100 percent sure, but I think maybe Rick Richards, but I don't know if there was anyone else there.
Q. Okay. Do you think it was Rick that introduced you two?
A. There again, I don't recall. I don't remember if I met Mr. Seikel previous to that or that time. There again, I see a lot of people.

Q. I understand, I understand. And I'm not here to really test the strength of your memory, because I know we're talking about things that happened over two years ago, so if you don't recall, that's perfectly fine. I just want to see what you do remember.

With that being said, during this meeting when you met Terence Seikel, at any point in time, did you tell him that you would like to talk to him because you might be interested in purchasing Octane Environmental?

A. I don't know if it would be stated exactly like that. But most everybody that comes into a restaurant in the evening and knows you're in the oil and gas business wants to boast about what they're doing and you're doing.

And at the end of the day, at that point in time, I don't recall the exact discussions, but it could've happened, whether he was talking to me or vice versa.

Q. Okay. So do you have any specific recollection -- and obviously, it didn't have to be these exact words. But do you have any recollection of telling Mr. Seikel that you might be interested in purchased Octane?

A. I think that that could've happened. I mean,

at the end of the day, we -- we're in that space and I believe -- and I'm not sure -- we might have been buying containment from Octane.

Q. Are you talking about ASTs, aboveground storage tanks?

A. I'm just talking about containments for smaller -- like a frac tank or containments related to -- we call them bird baths. You have to put them under equipment when it's running in case there's oil dripping or something, but I believe that we bought some from him, but there again --

Q. You said we bought some. I assume that's one of your companies?

A. Either Applied Construction or maybe Energy Transportation.

Q. Okay. I think I may have already asked you this. But do you know how many times you have actually talked to Terence Seikel?

A. I think I could probably count them on less than one hand.

Q. Okay. So two, maybe three times?

A. Less than five.

Q. Okay. Aside from possibly discussing a sale of Octane or just the oil and gas industry, do you

remember anything else about the conversations that you had with Terence Seikel?

A. There again, if you're saying it's back in '17, I'd have to -- to be honest with you, if Terry or Terence walked in the room, you'd have to point him out to me right now. I can't get a recollection of his face.

Q. Fair enough, fair enough.

How about Joseph Seikel, have you ever met him?

A. Maybe. But there again, I meet a lot of people.

Q. Okay. Do you have any recollection of meeting Joseph Seikel?

A. Not as I sit here today.

Q. Okay.

A. Maybe back to your other question, I might have been at the restaurant under the influence of alcohol.

Q. I understand. Sometimes that hinders our memory, right?

A. I don't -- I'm just kidding. I just --

Q. [REDACTED]

[REDACTED]

Q. Did you and Rick ever discuss him coming to work for Energy Resource Group?

A. I don't believe that I had discussed with him Energy Resource Group, but there again, that's Jason Henderson's company. I could've maybe been at a meeting where -- like a -- at the -- like say at the restaurant where Jason has introduced me to Rick, because I don't even recall the first time that I met Rick, so it was either with Terence or one other time.

But you know, at the end of the day, I wouldn't be representing Energy Resource Group for Jason.

[REDACTED]

Page 17

Q. In April and May of 2018, what was your role with Energy Resource Group?
A. I have no idea. Because I didn't own it, and I don't believe that -- mostly what I recall is I was renting employees off of Energy Resource Group or subcontracting work to them.
Q. Do you remember when that was?
A. Not specifically.

Page 18

Q. Okay, okay. Do you know who Aaron Giles is?
A. I know Aaron, worked for ERG for Jason.
Q. Okay. Did you ever have any discussions with him?
A. You know, I don't -- there again, I'm sure I had discussions. I don't recall the detail to it.

Page 19

[redacted]

Q. And again, she just said, he just told them that he supported work in West Virginia and that if they wanted to come work for him he was just explaining that he had jobs available for them if they wanted to come work there. So does that sound like something that you might have said?

A. In a generalized form, you know, I like employing people in West Virginia and I do care about West Virginia. I don't believe that I was hiring those people. I think ERG was hiring them, and to the tense that come work is I had projects that I was, you know, subcontracting to ERG -- and not really subcontracting, providing labor on.

Q. Okay. So you weren't offering them a job at ERG; is that what you're saying?

A. No. Because I didn't own ERG.

Q. Okay.

A. But I was more supporting my CFO, who's -- I don't know if you know -- is handicapped and you know, just being positive to whatever his decision was there

to, you know, start a company, which I believe he started earlier to this date, but I don't know the exact dates.

Q. You said you were supporting your CFO. You're talking about Jason, correct?

A. Correct.

Q. Why did you say your CFO?

A. Well, so he is the CFO of Energy Transportation.

Q. Okay.

A. And if you look at my history, I like to see people be entrepreneurial and I encourage people to start businesses.

Q. Okay. So you were just providing him the -- basically a pat on the back kind of support, like hey, I'm here to support you?

A. You know, I look at -- you know, why does NASCAR put Dupont on the hood of the car, you know, or why does Dupont put their name on the hood of a car? I don't know.

I think there's a little bit of value to my brand in our region, and I'm willing to lend that brand to somebody like Jason that I believe is a good person.

Q. Okay. I understand that.

So in essence, by -- you know, you want to help Jason out by backing him up and you know, saying, hey, he works for my other company, does a great job, so I think he'll do that with this company too; is that a good way to put it?

A. Yeah. To use an example, I own the Wonder Bar restaurant, but I have a partner that owns 49 percent of it and manages it. That's a different setup because we own the real estate, so -- but we -- you know, we have partners, and we have people that we encourage -- or not really encourage -- you know, offer our mentoring to.

[redacted]

[redacted]

Q. Okay. At any point in time, did you ever represent to anybody that you were an owner or part owner of Energy Resource Group?

MR. CARDI: Object to form.

A. Not that I recall.

Q. Okay.

A. I think there's a lot of people that make their own ascertations out of a discussion. But I don't own the West Virginia Mountaineers, but I feel like I do, not this past weekend though.

Q. I was going to say, which team, football or basketball.

[redacted]

Page 25

[redacted]

Page 26

[redacted]

Page 27

[redacted]

Page 28

[redacted]

Case 2:20-cv-05286-ER   Document 28-9   Filed 11/09/22   Page 10 of 14
Ernest Richards, II and Rick Richards v.
Octane Environmental, LLC, et al.
David Alvarez
October 27, 2020

Page 29

[redacted]

Page 30

[redacted]

Page 31

[redacted]

Page 32

4   Q. Okay. No. That's fine.
5       You mentioned Travis and Ernie. You said they
6   were employees that worked for a company that does
7   support work for one of your companies.
8   A. Well, it was a company called ET360, and they
9   supported -- that company supported a lot with Applied
10  Construction and/or Energy Transportation and such.
11  Q. Okay. And your involvement with ET360, is
12  that one of your companies?
13  A. I started it with another individual.
14  Ultimately, Jason took it over.

[redacted]

Page 33

[redacted]

Page 34

[redacted]

Page 35

[redacted]

Page 36

[redacted]

Page 37

[redacted]

Page 38

[redacted]

Page 39

[redacted]

Page 40

[redacted]

Case 2:20-cv-05286-ER   Document 28-9   Filed 11/09/22   Page 13 of 14

Ernest Richards, II and Rick Richards v.
Octane Environmental, LLC, et al.

David Alvarez
October 27, 2020

Page 41

[redacted]

Page 42

```
 1              -----
 2          (Brief break)
 3              -----
 4   BY MR. HOPPER:
 5      Q.  Mr. Alvarez, just a couple quick follow-up
 6   questions.  I want to make sure I heard something
 7   correctly.  I think you stated that you don't and you've
 8   never had an ownership interest in ERG.  Did I hear that
 9   correctly?
10      A.  Not to -- yeah, you did.  To my knowledge, I
11   never owned a piece of ERG.
12      Q.  Okay.
13      A.  I've never had a tax return.
```

[remainder redacted]

Page 43

[redacted]

Page 44

[redacted]

-----



THE STATE OF WEST VIRGINIA :
: SS: C E R T I F I C A T E
COUNTY OF HARRISON :

I, AMY C. HARRIS, CCR, Certified Court Reporter and Notary Public within and for the State of West Virginia, duly commissioned and qualified, do hereby certify that the within-named witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; and then testimony then given by the witness was by me reduced to text and recorded by Stenomask; afterwards reduced to transcription under my direction and control; that the foregoing is a true and correct transcription of the testimony given by said witness.

I do further certify that this testimony was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney of either party, or otherwise interested in the event of this action.

I certify that the attached transcript meets the requirements set forth within Chapter 47, Article 27 of the West Virginia Code.

IN WITNESS THEREOF, I have hereunto set my hand and affixed my seal of office at Clarksburg, West Virginia, on the 1st day of November 2020.

WV Depos
304-566-7800



ERRATA SHEET

I, the undersigned, DAVID ALVAREZ, do hereby certify that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below):

PAGE/LINE CORRECTION AND REASON FOR CORRECTION

______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________

______________________________________________

See attached sheet(s) for additional information:
______YES ______ NO

______________________________
(Signature)

Subscribed and sworn to before me this _____ day of _________________, 2020.

____________________________
Notary Public

My commission expires:

________________________

WV Depos
304-566-7800